# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# BEAUFORT DIVISION

| | |
|---|---|
| Miriam Hallett, Robert Hallett, Gregory Hall, Carrie Hall, and Kerin Jose Estrada-Aguilar, )<br>)<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>Government Employee Insurance Company, )<br>)<br>Defendant. )<br>) | C.A. No. 9:19-2319-RMG<br><br><br><br><br><br><br>**ORDER** |

This declaratory judgment action was tried by the Court without a jury on November 6, 2020.[1] The Court now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## **Findings of Fact**

1. This case involves the question of whether Plaintiff Miriam Hallett ("Ms. Hallett"), an insured of Defendant Government Employee Insurance Company ("GEICO"), was covered under GEICO Policy No. 4080-90-19-47 (the "Policy") for a February 20, 2017 motor vehicle accident in which she was driving a 2014 Land Rover ("Land Rover") that was owned by her son in law, Gregory Hall ("Dr. Greg Hall") and her daughter, Dr. Carrie Hall (referred to collectively as the "Drs. Hall") . Ms. Hallett acknowledges that she ran a red light that resulted in the accident. Plaintiff Kerin Jose Estrada-Aguilar ("Estrada-Aguilar") suffered significant

---

[1] By consent, the parties tried this case by remote contemporaneous transmission. At the commencement of the trial, the Court, pursuant to Fed. R. Civ. P. 43(a), found that compelling circumstances were present—i.e. the COVID-19 pandemic—to justify the remote proceedings and that appropriate safeguards were in place.

injuries as a result of the accident. Estrada-Aguilar brought an action in state court, which is pending in the Beaufort County Court of Common Pleas, against Ms. Hallett and the Halls for injuries suffered in the accident. GEICO has been providing Ms. Hallett a defense in the state court action under a reservation of rights.

2. The parties dispute the application of the coverage under the Policy for a "non-owned" vehicle. The Policy provides that an insured is covered while operating a non-owned vehicle so long as the insured (a) was using the non-owned vehicle with the permission of the owner; (b) the non-owned vehicle was not "furnished for the regular use" of the insured by the owner; and (c) the non-owned vehicle was not owned by a "relative," which is defined under the Policy as "a person who continuously lives in your household" and is related by blood or marriage. Plaintiffs' Exhibit 1-A at 5, 6.

3. Ms. Hallett was involved in a motor vehicle accident late on the evening of February 20, 2017, while operating the Land Rover owned by the Drs. Hall. Ms. Hallett was driving the Land Rover to pick up a granddaughter, Elizabeth Hall ("Elizabeth"), who was on her high school's lacrosse team and who had returned from an out of town game to her high school. Ms. Hallett volunteered to pick up her Elizabeth late in the evening because her son in law, Dr. Greg Hall, a radiologist, went on duty at 4:00 a.m. and her daughter, Dr. Carrie Hall, a dermatologist, had medical appointments scheduled early the next morning. Ms. Hallett was 79 years old at the time of the accident.

4. Ms. Hallett had her own personal vehicle, a two-seater Pontiac Solstice, that she regularly used and which had been insured for a decade by GEICO. She testified she obtained permission to use the Land Rover from Dr. Greg Hall that evening because the granddaughter

had lacrosse equipment and personal items that would be difficult to fit into her small automobile.

5.      The parties dispute how frequently and under what circumstances Ms. Hallett used the Halls' Land Rover.  In an interview with a GEICO adjustor on February 24, 2014, four days after the accident, Ms. Hallett stated she used the Land Rover to pick up a grandchild "from an activity or something that they do at school" when their parents were at work.  She was asked how often she used the Land Rover and she answered "maybe once a week or so."   Ms. Hallett subsequently provided sworn testimony in an affidavit, by deposition, and at trial.  Ms. Hallett's testimony seemingly varied on each telling, stating at different times that she never used the Land Rover before the day of the accident, used it only occasionally, or "maybe once a week."

6.      Dr. Greg Hall testified at the trial that the Land Rover was his primary personal vehicle.  He also owned a Porsche, which he testified he tried to avoid using routinely to avoid excess mileage.  He explained he performed his work as a radiologist primarily from home and that he used the Land Rover for personal tasks, such as going to the grocery store. Dr. Greg Hall testified that Ms. Hallett did not have a key to the Land Rover and needed to come to him to use the vehicle.  He testified Ms. Hallett used the Land Rover only occasionally.  On the night of the accident, Dr. Carrie Hall had intended to pick up the daughter from school when she returned from an out of town lacrosse team trip.  When it was reported the bus was delayed, Dr. Greg Hall testified that Ms. Hallett volunteered to pick up Elizabeth because the late hour presented a problem since both Drs. Hall had early morning duties.

7.      The Court carefully observed the testimony of Ms. Hallett, both what she stated as well as her mental acumen and capacity to process and articulate.  Ms. Hallett is now 82 years old and plainly has some limitations that became apparent when responding to rapid fire

questioning. After observing her testimony, the Court finds that the inconsistencies in Ms. Hallett's testimony were not an effort to deceive or misrepresent the facts but a reflection of limitations in memory, articulation and processing. In the medical setting, physicians would call such a person a "poor historian."

8. Dr. Greg Hall, on the other hand, provided highly consistent, logical and straightforward testimony. Dr. Greg Hall testified that Ms. Hallett had no access to the Land Rover without his permission and delivery of the keys, and that she used the Land Rover only occasionally. The Court finds Dr. Greg Hall's testimony highly credible. Based on all the evidence available in the record and weighing carefully the credibility of the witnesses, the Court finds that Ms. Hallett used the Land Rover only occasionally.

9. The parties further dispute whether Mr. and Ms. Hallett live in the same "household" as the Drs. Hall. The Halletts and the Halls both reside under the same roof in a large home on Hilton Head Island at 6 Millwright Drive in Hilton Head, South Carolina. The home has three levels. The Drs. Hall had four children residing then at the home, who were middle school and high school age. The Halletts occupy the ground floor of the home, which has approximately 1,000 square feet. The Halletts have their own entrance, living room, bedroom, full bath, storage area, refrigerator, hot plate, coffee maker, and garage. The Halletts are self-supporting, have their own financial resources, and pay their own bills, including automobile liability insurance with GEICO on two vehicles they personally own, Ms. Hallett's Solstice and her husband's pickup truck. The Halletts file their own tax returns and are not listed as dependents on the Halls' tax returns.

10. The Drs. Halls live on the upper two levels of the home with their children. The Halls manage their own affairs and have their own financial resources, with neither family

4

supporting the other.  Neither do the Halls and the Halletts merge financial resources.  The Halletts share, as needed, the upstairs kitchen and laundry room with the Halls.  The Halls and the Halletts do not regularly dine together, with the Halletts generally fixing their own food, getting takeout, or going out to dinner.   The residence is zoned as single family and the Halletts and Halls receive their mail at the same address.

## Conclusions of Law

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).  The amount in controversy exceeds $75,000 and there is complete diversity of citizenship among the parties.[2]  As a diversity action, the Court is obligated to apply the law of the forum state, South Carolina.  *Ragan v. Merchants Transfer and Warehouse Co.*, 337 U.S. 530, 532 (1949).

2.    It is well settled under South Carolina law that an insurance contract is subject to the general rules of contract construction.  "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language.  Courts must enforce, not write, contracts of insurance, and their language must be given its plain, ordinary, and popular meaning." *Pres. Capital Consultants, LLC v. First Am. Title Ins. Co.*, 406 S.C. 309, 316, 751 S.E.2d 256, 259 (2013) (quoting *Whitlock v. Stewart Title Guar. Co.*, 399 S.C. 610, 614, 732 S.E.2d 626, 628 (2012)).  "Policies are construed in favor of coverage, and exclusions in an insurance policy are construed against the insurer." *M and M Corp. of South Carolina v. Auto-Owners Ins. Co*., 701 S.E.2d 33, 35 (S.C. 2010).  Ambiguous terms in an insurance contract "must be construed liberally in favor of the insured and strictly against the

---

[2] The suits as originally brought by the Halletts, named the Halls and Estrada-Aguilar as defendants along with GEICO and was filed in the Beaufort County Court of Common Pleas. GEICO removed the action to federal court and made a motion to realign the parties, restyling the Halls and Estrada-Aguilar as plaintiffs. The Court granted that motion by Order dated September 18, 2019. (Dkt. No. 12).

insurer. However, if the intention of the parties is clear, courts have no authority to torture the meaning of policy language to extend or defeat coverage that was never intended by the parties." *Diamond State Ins. Co. v. Homestead Industries*, 456 S.E.2d 912, 915 (S.C. 2010).

<u>Meaning of "Household" Under the GEICO Policy</u>

3.     The term "household" is commonly used in a variety of insurance policies, sometimes to provide coverage to persons living within the same household and sometimes to exclude persons who live in the same household but are not listed as insureds. South Carolina cases have arisen in a variety of settings and addressed whether foster children, minor children of a non-custodial parent, grandchildren, and adult children residing primarily elsewhere are part of the same household as the named insured. *E.g. Auto-Owners Ins. Co. v. Langford*, 500 S.E. 2d 496 (S.C. App. 1998) (grandchild and great grandchild seeking to claim under grandparent/great grandparent's policy where visited only sporadically); *Richardson v. South Carolina Farm Bur. Mut. Ins. Co*., 519 S.E.2d 120 (S.C. App. 1999) (adult child living primarily in another residence claiming under father's insurance policy); *Auto-Owners Ins. Co. v. Horne*, 586 S.E. 2d 865 (S.C. App. 2003) (minor child of non-custodial divorced parent seeking to claim under the policy of the non-custodial parent); *Cook v. State Farm Auto Ins. Co.*, 656 S.E.2d 784 (S.C. App. 2008) (grandfather and granddaughter living nearby but not in same building).

4.     South Carolina, in the case of *State Farm Fire and Cas. Co. v. Breazell*, 478 S.E.2d 831 (S.C. 1996), adopted the standard for "household" first set forth in *A.G. by Waite v. Travelers Ins. Co*., 331 N.W.2d 643 (Wis. App. 1983):

        A.     Whether the parties are living under the same roof;

        B.     Whether the parties live "in a close, intimate and informal relationship;" and

    C. "Where the intended duration of the relationship is likely to be substantial, where it is consistent with the informality of the relationship, and from which it is reasonable to conclude the parties would consider the relationship in contracting about such matters as insurance or in their reliance thereon."

*Brazell*, 478 S.E.2d at 832.

  5. Both *Waite* and *Breazell* arose out of disputes over whether foster children were part of the insured's household. The foster children in these cases lived as an integrated part of the insured's family as if one of the nuclear family members ("close, intimate and informal relationship") but the living situation was temporary. Several South Carolina cases have addressed the issue of whether the person seeking insurance coverage actually resided in the same physical structure. These involved family members who lived on the same property but not in the same physical structure or once lived at the family residence but then resided primarily elsewhere. These cases have consistently applied the *Breazell/Waite* factors, often noting that "household" has no "absolute or precise meaning" and the Court is obligated to make a "fact-specific" inquiry based a totality of circumstances. *E.g. Auto-Owners Ins. Co. v. Horne*, 586 S.E.2d 865, 870-71 (S.C. App. 2004) (citing cases from foreign jurisdictions such as Connecticut, Illinois, Missouri and Washington State for the above propositions).

  6. None of the South Carolina cases to date have arisen out of a factual scenario analogous to the facts present in this case. The Halletts certainly reside under the same roof as the Halls but occupy their own discrete space within a very large residence and maintain their separate identity physically as well as financially. The Halletts are financially self-sufficient, own their own automobiles, and procure their own insurance. Rather than living in a "close,

intimate and informal relationship," they live separately and distinctly within their own physical space, albeit under the same roof. Further, the Halletts and Halls separate existences were obviously considered by the parties "in contracting about such matters as insurance," since they each procured their own insurance with different policies from different carriers for the vehicles they owned.

7. Other states' courts have addressed the meaning of the term "household" in an insurance policy where the insured's domestic situation is similar to that present in this case—namely, adult parents and children residing within the same physical structure but maintaining their separate physical and financial identities. These courts, using standards analogous to the *Breazell/Waite* test, have held in similar domestic settings that there were two households present within the same physical structure. In *State Farm Ins. Co. v. Snyder*, 178 S.E.2d 215, 217 (Ga. App. 1970), the Georgia Court of Appeals held that where there is a blood relationship between the parties but two families maintain their separate identities, the "critical distinction" is "whether separate domestic establishments are maintained." As the *Snyder* court explained, "[a] common roof is not the controlling element. It is rather a conclusion based on the aggregate details of the living arrangements of the parties." *Id.* at 586 (internal citation omitted).

In a factually analogous situation to this case, the Georgia Court of Appeals in *Burdick v. GEICO*, 626 S.E.2d 587, 588 (Ga. App. 2006), addressed a situation where an adult child and her daughter occupied the downstairs portion of her parents' home. The daughter had her own key, and her space contained a bathroom, refrigerator, and a microwave. The daughter paid her own bills. The *Burdick* court reversed a grant of summary judgment in favor of GEICO, noting that there was a factual issue regarding whether there were "separate households under different

management" residing in the same residence.  Similarly, in *So. Gen. Ins. Co. v. Foy*, 631 S.E.2d 419, 420-21 (Ga. App. 2006), which involved coverage of a "non-owned vehicle" under an auto insurance policy, the court addressed a situation where an adult child lived in a distinct portion of his mother's home and maintained a separate personal and financial existence from his mother.  The *Foy* court ruled that the mother and son had separate households within the common structure, that they were "responsible for separate parts of the house, live in different areas, do not cook or clean for each other, and come and go independently."  *Id.*

The Washington Court of Appeals addressed another factually analogous case in *Sturgill v. United Services Auto. Assn*, 930 P.2d 945 (Wash. App. 1997).  The court addressed the scope of "household" where an adult child and her father resided in the same residence but maintained separate physical and financial identities.  The father lived downstairs and the daughter with a child lived upstairs.   The court found that the father and daughter "each went their own way without regard to any social or family obligations to each other.  In other words, they did not compose a family; though they were father and daughter by blood, they were not father and daughter in their living arrangement.  Their households operated just as separately as if they occupied adjoining apartments in an apartment building, but shared a common area."  *Id.* at 947.  The *Sturgill* court concluded that "[t]he problem is this case is not defining 'residence' or 'household," it is applying the definition to the facts.  The undisputed evidence before the court established that [the parent and adult child] maintained separate domestic units under a common roof, and neither was a resident of the other's household."

In *Hoff v. Hoff*, 1 A.2d 506 (Pa. Sup. Ct. 1938), the court confronted the issue of two families residing in the same residence and whether they lived in a single household or separate households.  In one portion of the house, the plaintiff, his wife and child, resided and maintained

9

a separate physical existence. In another portion of the house, the plaintiff's parents resided. Each maintained their separate financial existence. The court observed that "[w]hen these two families arranged to live in one dwelling the result [is] not necessarily the creation of one household." The *Hoff* court concluded that the critical issue is "the existence of such domestic arrangements and circumstances as would create separate domestic establishments, each having its own head and separate management." *Id.* at 507-08.

8.      Having carefully weighed the Halletts' and Halls' domestic living situation in light of the *Breazell/Waite* factors, the Court finds that the two families constitute separate households. While the Halletts and Halls certainly resided under the same roof, they do not live in a "close, intimate and informal relationship" analogous to a nuclear family cohabitating together in a common space. To the contrary, they lead highly structured, distinctly separate personal and financial existences. They have consciously maintained two distinct family units under separate management. Moreover, relying on their separate existence, they purchased their own automobile liability insurance policies. As the third prong of the *Breazell/Waite* factor provides, the Halletts acted on this separate existence "in contracting about such matters as insurance." *Breazell* at 478 S.E.2d at 832. In short, although the parties live under the same roof, they do not meet the remaining elements of the *Breazell/Waite* test because they have two distinct households living separately in the same large physical structure. [3]

---

[3] Defendant GEICO repeatedly made the point in its filings and at trial that the Halletts and Halls live under a common roof owned by the Halls, suggesting this was the singular determinative factor in defining a "household" under South Carolina law. However, the *Breazell/Waite* standard includes three factors, each significant in defining the scope of a "household." If the only relevant factor was whether the parties lived under a common roof, the South Carolina courts would have adopted that singular factor as defining a "household." Further, it is notable that Defendant GEICO, which included in the Policy numerous detailed definitions for key terms, did not provide a definition for "household."

9. To establish coverage under the GEICO policy, Ms. Hallett must demonstrate that the non-owned vehicle she was driving was not owned by a "relative," defined as a person related by blood or marriage who "lives continuously in your household." Plaintiffs' Exhibit 1-A at 5. The Court finds and concludes, based on the record before the Court, that the owners of the Land Rover, the Drs. Hall, did not live within Ms. Hallett's "household" and are, thus, not "relatives" under the Policy.

<u>Whether the Halls' Land Rover was "Furnished for the Regular Use" of Ms. Hallett</u>

10. Under the GEICO policy, there is no coverage for the insured for a non-owned vehicle if that vehicle was "furnished for the regular use" of the insured. *Id*. "'Regular use,' as used in automobile liability policy provisions . . . suggests a principal use as distinguished from casual or incidental use." *Aetna Cas. & Sur. Co. v. Sessions*, 194 S.E. 2d 877, 155 (S.C. 1973). The South Carolina Court of Appeals in *South Carolina Farm Bur. Mut. Ins. Co. v. Windham*, 400 S.E.2d 497, 498 (S.C. App. 1990) described "regular use" to involve a situation where "the use of the car was steady or regular as opposed to casual or infrequent."

11. Based on the Court's factual finding that Ms. Hallett's use of the Land Rover was only occasional, the Court finds and concludes that the Land Rover was not furnished for the regular use of Ms. Hallett. Consequently, along with the findings that Ms. Hallett used the Land Rover on February 20, 2017 with the permission of Dr. Greg Hall and the Drs. Hall did not live within Ms. Hallett's household, the Court concludes that the Land Rover was a "non-owned" vehicle under the GEICO policy and, thus, the GEICO policy provided coverage for Ms. Hallett for the accident of February 20, 2017.

## Conclusion

Based on the foregoing, the Court concludes Ms. Hallett had coverage under the GEICO policy for the accident of February 20, 2017 while operating the Land Rover owned by the Drs. Hall.  Judgment is entered for Ms. Hallett.

**AND IT IS SO ORDERED.**

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

November 10, 2020
Charleston, South Carolina